Plea~~ ~~~ ~ate
Stamp ~ ~~~urn

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

LINDSAY FORD, LLC      *

     11250 Veirs Mill Road      *
     Wheaton, MD 20902      *

         Plaintiff,      *

     vs.      *    Case No. ___475663-V___

LEXINGTON INSURANCE COMPANY, *

     100 Summer Street      *
     Boston, MA 02110      *

     Serve on:      *
     Alfred W. Redmer, Jr.      *
     Insurance Commissioner      *
     Maryland Insurance Administration      *
     200 St. Paul Place, Suite 2700      *
     Baltimore, MD 21202      *

         Defendant.      *

**RECEIVED**

NOV 20 2019

Clerk of the Circuit Court
Montgomery County, Md.

## COMPLAINT

Plaintiff, Lindsay Ford, LLC ("Plaintiff" or "Lindsay Ford"), by and through its undersigned counsel, hereby submits this Complaint for declaratory relief, breach of contract, and failure to act in good faith, pursuant to Md. Code, Cts. & Jud. Proc. § 3-1701 and Md. Code, Ins. § 27-1001. In support thereof, Plaintiff states as follows:

### NATURE OF THE ACTION

1. This is a declaratory relief, breach of contract, and failure to act in good faith action brought against Defendant, Lexington Insurance Company ("Defendant" or "Lexington"), a member company of American International Group, Inc. ("AIG"), arising out of, and in connection with, an insurance policy to which Plaintiff is an insured.

2.  Specifically, Plaintiff brings claims against Defendant arising from Defendant's refusal to indemnify Plaintiff for damages incurred in relation to a fraudulent, criminal scheme inducing the sale of multiple automobiles owned by Plaintiff.

## PARTIES

3.  Plaintiff, Lindsay Ford, LLC is a Maryland limited liability company with its principal place of business at 11250 Veirs Mill Road in Wheaton, Maryland.  Plaintiff operates a car dealership selling both new and used vehicles in Wheaton, Maryland, and is an insured under the insurance policy at issue in this action.

4.  Upon information and belief, Defendant is a Delaware corporation with its principal place of business at 99 High Street, Boston, Massachusetts, 02110.  Defendant is an insurance company and issued the insurance policy at issue in this action.

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over this matter pursuant to Section 1-501 of the Courts & Judicial Proceedings Article of the Maryland Code.

6.  This Court has personal jurisdiction pursuant to Section 6-103 of the Courts and Judicial Proceedings Article of the Maryland Code.

**7.**  Venue is proper in this Court pursuant to Section 6-201 of the Courts and Judicial Proceedings Article of the Maryland Code.

## FACTS COMMON TO ALL COUNTS

### A. The Underlying Fraud

8.  Between July and September 2017, Lindsay Ford fell victim to an orchestrated criminal scheme through which multiple individuals, believed to be working in concert, fraudulently purchased at least seven (7) vehicles from Lindsay Ford.

9. Specifically, the following vehicles were sold as part of what was later discovered

to be a fraudulent, criminal scheme:

      a. On July 3, 2017, Lindsay Ford sold a 2014 Ford Edge to Henry Williams, for the amount of $29,214.00.

      b. On July 8, 2017, Lindsay Ford sold a 2016 Chrysler 300 to Henry Williams, for the amount of $27,455.00.

      c. On July 13, 2017, Lindsay Ford sold a 2017 Chevrolet Impala to Lourawl McIntosh, for the amount of $35,022.24.

      d. On July 18, 2017, Lindsay Ford sold a 2016 Ford Escape to Lourawl McIntosh, for the amount of $35,960.40.

      e. On July 20, 2017, Lindsay Ford sold a 2016 Nissan Maxima to Alea Cummings, for the amount of $44,582.40.

      f. On July 21, 2017, Lindsay Ford sold a 2016 Chevrolet Camaro to Nicole Wayne, for the amount of $41,152.16.

      g. On September 23, 2017, Lindsay Ford sold a 2014 Jeep Cherokee to Ebony Hutchinson, for the amount of $33,709.00.

10. The purchasers took advantage of Lindsay Ford's financing options to complete each of these purchases, such that Lindsay Ford received only a small portion of the sale amount for each vehicle. Thus, while the aggregate sale amount for the seven vehicles totaled $247,095.92, Lindsay Ford received just $52,213.86 in payments from the purchasers, and financed a combined $194,882.06 relating to the purchases.

11. In September 2017, Lindsay Ford's finance department encountered issues registering these vehicles, and Lindsay Ford thereafter investigated the purchases.

12. Through its investigation, Lindsay Ford discovered that the purchasers of these vehicles had provided false information in order to secure financing and purchase the vehicles.

13. Specifically, Henry Williams had provided a forged or fake Pennsylvania driver's license when applying to purchase the Ford Edge and Chrysler 300.

14. Similarly, Lourawl McIntosh provided a forge or fake Pennsylvania driver's license when applying to purchase the Chevrolet Impala and Ford Escape.

15. Likewise, Alea Cummings provided a Maryland driver's license with an incorrect soundex in order to purchase the Nissan Maxima.

16. Ebony Hutchinson also provided a forged or fake Illinois driver's license when applying to purchase the Jeep Cherokee.

17. Upon further investigation, Lindsay Ford also discovered that each of the purchasers of these vehicles were apparently working together or as part of a collaborative scheme in order to fraudulently purchase the vehicles.

18. Specifically, Lindsay Ford discovered that each purchaser had advised that "Nicole Wayne" – who herself was one of the fraudulent purchasers – had referred them to Lindsay Ford to make their vehicle purchases.

19. The purchasers also provided apparently false or forged employment information in order to secure financing. Specifically, each purchaser had listed "RSM" as his or her employer, and had provided pay slips in order to verify employment. However, further investigation of the purchasers' credit histories revealed that they were each merely listed as "authorized users" on the credit account(s), and did not appear to be employed by RSM.

20. The purchasers also provided the same or similar phone numbers on their applications, but when Lindsay Ford called such numbers, it appeared that the numbers were no longer in operation or the person who answered the phone call refused to answer any questions regarding vehicle purchases.

21. Moreover, after taking possession of the vehicles, the purchasers failed to make any contact with the banks and/or lenders, and no payments were ever made pursuant to the applicable financing agreements.

22. On July 31, 2018, upon discovering this orchestrated fraudulent scheme, Lindsay Ford contacted the Montgomery County Police Department and made a police report (the "Police Report"). A true and accurate copy of the Police Report is attached as **Exhibit A** hereto.

23. The police then entered each of the seven fraudulently-purchased vehicles into the National Crime Information Center ("NCIC") as stolen vehicles.

24. According to the Police Report, the start date of the fraudulent purchasing scheme was July 3, 2017, and the end date was July 31, 2018. (*See* Ex. A, p. 1.)

**B. The Governing Insurance Policy**

25. To protect Lindsay Ford against losses incurred in the sale or theft of automobiles – i.e., the very types of losses at issue in this action – Lindsay Ford's parent company, Lindsay Automotive Group, had purchased insurance from Defendant.

26. Specifically, Lexington issued an Inland Marine Dealers Open Lot Policy, Policy Number 015909396 (the "Policy") to Lindsay Automotive Group and Lindsay Ford, with the Policy Period from July 1, 2017 through July 1, 2018. A true and accurate copy of the Policy is attached as **Exhibit B** hereto. The Policy was subsequently renewed and extended.

27. Lindsay Automotive Group – the parent company of Lindsay Ford – is the first named insured under the Policy. (*See* Ex. B, Policy Declarations, p. 1.)

28. Lindsay Ford is expressly listed as an additional "Named Insured" under the Policy. (*Id.*, Additional Named Insured Endorsement, p. 1.)

29. The Policy was delivered to Lindsay Automotive Group's broker, Willis of Maryland, Inc. in Hunt Valley, Maryland.

30. Furthermore, Lindsay Automotive Group paid the Policy premiums through its broker, Willis of Maryland, Inc., likewise from Maryland.

31. The Policy specifically includes a "Trick, Device and False Pretense Coverage Extension."

32. Under this coverage extension, the Policy covers "loss which [Lindsay Ford] incur[s] as a result of any person causing [Lindsay Ford] to voluntarily... part with evidence of title to or possession of a Covered Automobile as a result of a fraudulent trick or scheme or under false pretense" that is criminal in nature. (*Id.*, Policy Sec. IV.A.)

33. More specifically, coverage is available under this extension to the extent "such acquisition or parting of title or automobile" was "induced by a criminal scheme, criminal trick, criminal device or criminal false pretense." (*Id.*)

34. The Policy further expressly identifies the use of "[f]orged or counterfeit instruments received in payment" and the use of "[f]raudulent or forged identification information on a purchase, rental, or lease documents" as examples of covered "fraudulent" conduct if "part of a criminal scheme, criminal trick, criminal device or criminal false pretense." (*Id.*)

35. The losses in question meet all of these terms.

36. First, all of the vehicles in question are "Covered Automobiles" under the Policy. Each vehicle is a private passenger vehicle which was held by Lindsay Ford for sale or lease at the time of the purchases. (*Id.*, Policy Sec. VIII(A).)

37. Second, Lindsay Ford "voluntarily . . . part[ed] with evidence of title to or possession of" each of these "Covered Automobiles," when the fraudulent purchasers

drove the vehicles away from Lindsay Ford's lot upon completing the sale and purchase of the vehicles. (*Id.*, Policy Sec. IV(A).)

38. Third, Lindsay Ford did so "as a result of a fraudulent trick or scheme or under false pretense" that was criminal in nature. (*Id.*)

39. That is, the sale of each of the vehicles in question was "induced by a criminal scheme, criminal trick, criminal device or criminal false pretense." (*Id.*)

40. Indeed, the purchasers for each vehicle provided Lindsay Ford with fraudulent, forged, or counterfeit documents and identification information in effectuating these transactions.

41. For example, the Police Report demonstrates that the purchasers provided false or forged driver's licenses to Lindsay Ford, and "all of the purchasers listed RSM as their place of work [and] provided pay slips. However, when their credit was run all of the credit histories came back as 'authorized users'" on the purported "RSM" credit accounts, and the purchasers did not appear to have actually been employees. (Ex. A, Police Report, p. 8.)

42. The Police Report further demonstrates that the purchasers provided the same, apparently false phone numbers, a majority of which were nonworking or went unanswered.

43. Moreover, the Montgomery County Police Department concluded that all of this fraudulent conduct was criminal, reporting the vehicles in question as stolen.

44. Finally, as detailed further below, Lindsay Ford incurred substantial losses as a result of this fraudulent, criminal scheme.

## C. Defendant's Coverage Denial

45. Promptly upon discovering the fraudulent, criminal scheme Lindsay Ford placed Defendant on notice of its losses, by making a separate claim for each fraudulently-purchased vehicle under the Policy. Specifically, Lindsay Ford had reported each of its seven claims arising from the seven vehicles by September 19, 2018, within approximately six weeks of discovering the fraud and reporting it to the police on July 31, 2018.

46. On September 20, 2018, Defendant denied coverage for the losses incurred in relation to the claim relating to the Jeep Cherokee. Defendant predicated its denial on the incorrect assertion that the vehicle had not been reported as stolen and, therefore, did not fall within the "Trick, Device, and False Pretense Coverage Extension" – despite the fact that the vehicle had, in fact, been reported as stolen -- without further explanation or analysis of its reasoning.

47. Subsequently, over two months later, on November 26, 2018, Defendant sent six additional letters denying coverage for the claims arising from the other six stolen vehicles. Defendant again denied coverage for these vehicles on the unsupportable basis that there was no "evidence" indicating that a criminal trick, device, or scheme had been used to acquire the vehicles, again providing no further explanation or analysis of its reasoning. Defendant also stated in its November 26 letters that the claims had not been reported timely.

48. By letter and email sent on January 24, 2019, Lindsay Ford (through its counsel) responded to Defendant's coverage denials, outlining in detail the basis through which the Policy affords coverage for Lindsay Ford's losses incurred, correcting clear

misstatements of the operative facts, and asking Defendant to promptly reconsider its denial of coverage accordingly.

49. Defendant failed to respond to Lindsay Ford's January 24, 2019 letter.

50. Lindsay Ford (through its counsel) followed up with Defendant's claims analyst on April 10, 2019, inquiring when Lindsay Ford could expect to receive a written response.

51. In response, on April 12, 2019, Defendant replied that the matter "has been escalated to my manager and our legal team," and advised that Defendant would respond "as soon as possible if our [coverage] position will change."

52. Defendant, however, did not provide any additional update or communication for several months.

53. On June 25, 2019, Lindsay Ford again followed up with Defendant regarding the status of its review of the coverage determination and Lindsay Ford's response.

54. Finally, on July 3, 2019, Defendant – through its agent, AIG Claims, Inc. – advised only that "[a]t this time we are standing by our denial letter previously submitted."

55. Defendant failed to specify which of the seven separate denial letters it was "standing by."

56. Defendant also did not provide any substantive response to any of the points raised in Lindsay Ford's response letter sent on January 24, 2019, and did not offer any further explanation of its coverage determination.

57. Indeed, at no point since its initial coverage determinations has Defendant provided any substantive explanation of its coverage position or sought any further information from Lindsay Ford.

58. Moreover, Defendant failed to explain, correct, or even acknowledge plain misstatements of the operative facts – including, for example, its incorrect statement that the Jeep Cherokee had not been reported as stolen, or its misstatement that "[t]here is no evidence supplied that indicates a criminal trick, device or scheme was used to acquire" the vehicles, despite the Police Report's conclusion (which was provided to Defendant on two occasions during its coverage investigation) that there had been such a scheme.

### D. Lindsay Ford Has Suffered Significant Losses

59. As the result of the fraudulent purchases, the banks and lenders involved in arranging financing for the vehicles in question have demanded repayment from Lindsay Ford. Accordingly, Lindsay Ford faces significant losses arising from the fraudulently-purchased and/or stolen vehicles.

60. Specifically, Lindsay Ford was forced to pay $32,619.00 in relation to the Jeep Cherokee, and has not been able to recoup any of this loss, as it has not located or recovered the vehicle.

61. Lindsay Ford ultimately recovered the Ford Edge, but it resold it at a loss, incurring a total loss of $24,740.24.

62. Lindsay Ford ultimately recovered the Nissan Maxima and likewise resold it at a loss, incurring a total loss of $16,554.63.

63. Lindsay Ford ultimately recovered the Chevy Camaro and likewise resold it at a loss, incurring a total loss of $13,162.00.

64. Lindsay Ford also recovered the Ford Escape and has listed, but has not yet been able to resell, the vehicle. It is anticipated that Lindsay Ford will incur a loss of at least $13,098.67 after the vehicle is resold.

65. In total, Lindsay Ford has already incurred losses of at least $100,174.54 as the result of the fraudulent purchases.

66. Lindsay Ford has not been able to locate or recover the Chrysler 300 or the Chevy Impala. Accordingly, Lindsay Ford anticipates that significant additional losses will result when the balance on those vehicles must be repaid to the lenders, particularly if the vehicles are not recovered and resold.

## COUNT I
### (Declaratory Judgment)

67. Lindsay Ford reasserts and re-alleges the allegations contained in paragraphs 1 through 66 above, and incorporates those allegations by reference as if set forth fully herein.

68. Lindsay Ford has satisfied all obligations required of it under the Policy.

69. The parties disagree as to whether Defendant is obligated to indemnify Lindsay Ford for its losses under the Policy's terms.

70. Defendant, for its part, has denied coverage for Lindsay Ford's claims and refused to indemnify Lindsay Ford for losses incurred in relation to each of the seven above-described, fraudulently-purchased and/or stolen vehicles.

71. Lindsay Ford, for its part, contends that Defendant's denial of coverage has no basis in law or in fact.

72. Accordingly, there exists an actual case or controversy between Lindsay Ford and Lexington regarding the construction, and the rights and liabilities of the parties under, the Policy.

73. Under Md. Code, Cts. & Jud. Proc. § 3-409(a), this Court may grant a declaratory judgment which will serve to terminate the uncertainty or controversy giving rise to this proceeding, namely, the parties' rights and obligations under the Policy.

WHEREFORE, Lindsay Ford respectfully requests that the Court:

A. Determine and adjudicate the rights, obligations, and liabilities of the parties under the Policy;

B. Find and declare that Lindsay Ford is entitled to indemnification under the Policy for all losses incurred with respect to the fraudulently-purchased and/or stolen vehicles;

C. Award Lindsay Ford all damages arising from Defendant's wrongful refusal to acknowledge and honor its coverage obligations to Lindsay Ford under the Policy, in amounts to be proven at trial but in excess of $75,000, plus consequential damages, attorneys' fees and costs, and pre- and post-judgment interest to the extent permitted by law; and

D. Award Lindsay Ford such other and further relief as justice and this cause require.

## COUNT II
### (Breach of Contract)

74. Lindsay Ford reasserts and re-alleges the allegations contained in paragraphs 1 through 73 above, and incorporates those allegations by reference as if set forth fully herein.

75. The Policy is a valid and enforceable contract between Lindsay Ford and Defendant.

76. Lindsay Ford has fully performed its obligations under the Policy.

77. Defendant is obligated to indemnify Lindsay Ford for its losses under the Policy's terms.

78. Defendant has denied coverage for Lindsay Ford's claim and has refused to indemnify Lindsay Ford for its losses.

79. Defendant's denial of coverage and refusal to indemnify Lindsay Ford have no basis in law or in fact, and constitute a breach of its obligations under the Policy.

80. As a direct and proximate result of Defendant's breach of the Policy, Lindsay Ford has suffered damages, including losses in excess of $100,000 incurred in relation to the fraudulently-purchased and/or stolen vehicles.

WHEREFORE, Lindsay Ford respectfully requests that the Court:

A. Enter a money judgment in its favor and against Lexington for all damages arising from Defendant's wrongful refusal to indemnify Lindsay Ford under the Policy, in amount to be proven at trial but in excess of $75,000, including, without limitation: 1) actual losses incurred from the sale of the vehicles in question and payment to the lenders owed under financing agreements; 2) consequential damages; 3) fees and costs incurred, including attorneys' fees, which continue to accrue; and 4) pre- and post-judgment interest to the extent permitted by law; and

B. Award Lindsay Ford such other and further relief as justice and this cause require.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable in this action.

Respectfully submitted,

_____
Rosalyn Tang
Matthew M. May
Miles & Stockbridge P.C.
11 N. Washington Street, Suite 700
Rockville, Maryland 20850
(301) 762-1600
rtang@milesstockbridge.com
mmay@milesstockbridge.com

_____
Alexander P. Creticos
Miles & Stockbridge P.C.
100 Light Street
Baltimore, Maryland 21202
(410) 823-8155
acreticos@milesstockbridge.com
*Counsel for Plaintiff, Lindsay Ford LLC*